UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LESHAUN BENJAMIN,

                            Plaintiff,

        v.                                    Case No. 18-cv-570-pp

ALICIA SANCHEZ,

                            Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 92) AND DISMISSING CASE

Plaintiff Leshaun Benjamin, who is represented by counsel, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against a nurse at the Milwaukee Mental Health Complex (MMHC). The defendant has moved for summary judgment. Dkt. No. 92. The plaintiff opposes the motion. Dkt. No. 104. The court finds that the defendant is entitled to qualified immunity as a matter of law and will grant her motion and dismiss the case.

## I.    Facts

### A.    Procedural Background

On April 11, 2018, the court received the plaintiff's complaint asserting claims against over a dozen defendants (at the time, the plaintiff was representing himself). Dkt. No. 1. On May 10, 2018, the court received the plaintiff's motion to supplement his claims and add new defendants. Dkt. No. 9. On September 12, 2018, the court denied that motion and ordered the plaintiff to file an amended complaint containing all the related claims that he

wished to pursue in this lawsuit. Dkt. No. 11. The plaintiff did not file an amended complaint by the deadline the court gave him, but he did notify the court that he had been released from custody and was living in Milwaukee. Dkt. No. 14. On November 29, 2018, the court extended to December 28, 2018 the deadline for the plaintiff to file an amended complaint, and sent that order to him at the address he had provided to the court. Dkt. No. 15. The court did not receive an amended complaint by the December 28, 2018 deadline, but it did receive from the plaintiff a letter asking for information. Dkt. No. 16. The court learned from the envelope in which he mailed that letter that the plaintiff again was incarcerated. Dkt. No. 17 at 2. On January 11, 2018, the court updated the plaintiff's address and issued an order giving him a final deadline of March 15, 2019 by which to file an amended complaint. Id. at 3. The court advised the plaintiff that if it did not receive an amended complaint by that deadline, the court would dismiss the case without prejudice. Id.

On January 23, 2019, the court received the plaintiff's amended complaint, naming Nurse Alicia Sanchez as the only defendant. Dkt. No. 18. On March 4, 2019, the plaintiff notified the court that he had been transferred to Waupun Correctional Institution. Dkt. No. 19. The court screened the amended complaint and allowed the plaintiff to proceed on a claim that Nurse Sanchez had injected the plaintiff with "what were possibly antipsychotic drugs against his will while he possibly was involuntarily committed at the MMHC in September 2016." Id. at 6–7. The court observed that it was unclear whether the plaintiff was a pretrial detainee or a convicted incarcerated person at the

time of the events described in the complaint, but it concluded that in either scenario the plaintiff's claim was based on alleged violations of the Due Process Clause of the Fourteenth Amendment. Id. at 5–6.

On July 13, 2020, the court referred the case to Magistrate Judge Nancy Joseph to handle pretrial matters. Dkt. No. 22. On August 19, 2020, Judge Joseph issued a scheduling order setting deadlines by which the parties must complete discovery and file dispositive motions. Dkt. No. 30. On August 24, 2020, the plaintiff filed a motion asking the court to allow him to amend his complaint—again. Dkt. No. 31. Judge Joseph denied that motion but updated the plaintiff's request for relief to reflect his demand of $1 million in damages. Dkt. No. 32. On January 1, 2021, the case was returned to this court for all further proceedings.

On April 12, 2021, in response to a slew of filings from the plaintiff, the court stayed all pending deadlines and ordered the parties to appear for a May 12, 2021 status conference. Dkt. No. 57. During that hearing, the court granted the plaintiff's request to reopen discovery, denied his motions for preliminary relief or a temporary restraining order and granted the plaintiff's motion to recruit counsel. Dkt. No. 60. On December 8, 2021, the court issued an order notifying the parties that Attorney James Santelle had agreed to represent the plaintiff on a volunteer basis. Dkt. No. 63.

On February 10, 2022, the court held a status conference with the parties, including newly recruited counsel for the plaintiff. Dkt. No. 71. The court scheduled another status conference for March 30, 2022 to allow counsel

3

for both sides more time to become more familiar with the case. Id. At the March 30, 2022 status conference, the court issued new deadlines by which the parties must complete discovery and file amended pleadings. Dkt. No. 73. The court scheduled another status conference for October 12, 2022. Neither party filed anything between the March 30 and October 12, 2022, conferences.

During the October 12, 2022 conference, the plaintiff's counsel told the court that he had prepared an amended complaint but would not be ready to file it for another week or two. Dkt. No. 75. The court ordered counsel to file the amended complaint by October 24, 2022 and scheduled another status conference for November 10, 2022. Id. At the October 24, 2022 deadline, the court received plaintiff's motion to amend his complaint and the proposed amended complaint. Dkt. No. 76. On November 10, 2022, the defendant filed a response in opposition to the motion to amend. Dkt. No. 77. The same day, the court held another status conference. Dkt. No. 80. The plaintiff's counsel explained that he had reviewed defendant's opposition to the motion to amend the complaint and asked for time to file a reply. Id. The court denied that request, advising counsel that it had concluded that the proposed amended complaint failed to state a claim against Milwaukee County and no longer included the claim against Nurse Sanchez. Id. The plaintiff's counsel asked the court to allow him to file an amended motion and a proposed third amended complaint "to address the court's concerns." Id. The court granted that request, ordered counsel to file the motion and third amended complaint no later than November 21, 2022, allowed defense counsel to file a response by December 2,

2022 and ordered the plaintiff to file a reply (if he chose to do so) by December 9, 2022. Id.

On November 21, 2022, the court received the plaintiff's amended motion to amend his complaint and the proposed third amended complaint. Dkt. No. 81. The defendant again filed a brief opposing the plaintiff's motion, dkt. no. 82, and the plaintiff filed his reply brief in support, dkt. no. 83. On June 11, 2023, the court issued an order denying the plaintiff's motion to amend his complaint. Dkt. No. 86. The court explained that the proposed third amended complaint sought to proceed against three new defendants, but the claims against those defendants were untimely; the only defendant named in both the original and third amended complaint was Nurse Sanchez. Id. at 12–13. The court concluded that allowing the plaintiff to amend his complaint and to proceed on the third amended complaint "would be futile because it fails to state a plausible claim against Sanchez." Id. at 18. The court explained that it had received a letter from the plaintiff himself (not his attorney) expressing concern about his recruited counsel's representation. Id. at 21. The court "encourage[d] the plaintiff to be patient and to try to cooperate with his lawyer." Id. at 22. The court explained that the plaintiff's amended complaint (Dkt. No. 18) remained the operative complaint. Id. at 23.

On June 14, 2023, the court issued an amended scheduling order, providing a deadline of August 14, 2023 by which the parties must file dispositive motions. Dkt. No. 87. On August 8, 2023, the court granted the defendant's unopposed motion to extend that deadline to August 28, 2023.

Dkt. No. 90. At the August 28, 2023 deadline, the court received the defendant's motion for summary judgment. Dkt. No. 92. The court twice granted the plaintiff's motions for an extension of time to file his response to the defendant's motion. Dkt. Nos. 101, 103. On November 3, 2023, the court received the plaintiff's response and supporting materials. Dkt. No. 104. The defendant's motion is now fully briefed and ready for disposition.

B.     Factual Background

1.     *The Allegations in the Amended Complaint*

The plaintiff filed the amended complaint on the court's form for incarcerated persons proceeding without an attorney. Dkt. No. 18. The plaintiff signed his complaint and "declare[d] under penalty of perjury that" its contents are "true and correct." Id. at 5. The court treats the verified complaint as "the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" Beal v. Beller, 847 F.3d 897, 901 (7th Cir. 2017) (quoting Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996)).

The court detailed the complaint's allegations in the screening order:

> The plaintiff alleges that on September 8—he doesn't say which year—Milwaukee Police Department officers escorted him to the Milwaukee Mental Health Complex. Dkt. No. 18 at 2. There, the plaintiff says he spoke with a Nurse Alicia Sanchez. He states that he attempted to explain to Nurse Sanchez what had happened to him while he was at St. Francis Hospital and how his medications had been misplaced. Id. He asserts that Nurse Sanchez began to doubt him, telling him that he was lying after laughing at him. Id. The

plaintiff says that this caused him to become very upset and defensive. Id.

The plaintiff says that after his conversation with Nurse Sanchez, he walked to the television area where he watched television for about forty minutes. Id. He states that "out of the blue," Nurse Sanchez and security came and "escorted [him] to the restraint bed where [he] was then stuck with a needle." Id. He states he "told 'Sanchez' that she [could not] force medication upon [him] against [his] will which is a violation of [his] constitutional rights." Id. at 2-3.

Dkt. No. 21 at 3–4. The plaintiff seeks $1 million in compensatory and punitive damages. Id. at 4; Dkt. No. 32.

2.  *Psychiatric Crisis Services at the Milwaukee County Behavioral Health Division*

At all relevant times, defendant Sanchez was a registered nurse working for Milwaukee County. Dkt. No. 93 at ¶9.[1] On September 9, 2018, the defendant was working at the Psychiatric Crisis Services Emergency Room (PCS) at Milwaukee County Behavioral Health Hospital. Id. at ¶¶10–11. The plaintiff was a patient at the hospital on the morning of that day. Id. at ¶11.

The defendant submitted a declaration from Dr. Larry Sprung, a psychiatrist who worked for Milwaukee County Behavioral Health Division (BHD) as a psychiatrist assigned to the PCS at the hospital. Dkt. No. 95 at ¶¶1–2. Dr. Sprung explains that individuals whom law enforcement detain under

_____

[1] The court has not relied heavily on the defendant's proposed findings of fact, dkt. no. 93, because those facts rarely cite the correct supporting evidence. The plaintiff does not dispute most of the proposed facts and did not offer his own proposed facts. Accordingly, the court has relief on the declarations, exhibits and deposition transcripts in its effort to recount an accurate explanation of all versions of the facts.

7

Wis. Stat. §51.15 "come through PCS" under what is considered "an emergency detention." Id. at ¶6. Those individuals must pass through PCS for an assessment to determine if they meet the criteria for admission to the BHD. Id. at ¶4. Wisconsin Statute §51.15 allows for emergency detention and "treatment by the least restrictive means appropriate" of an individual who meets several criteria, including that they "(1) are mentally ill, drug dependent, or developmentally disabled; (2) are dangerous to themselves or others as defined in the statute; and (3) are reasonably believed to be unable or unwilling to cooperate with voluntary treatment." Dkt. No. 93 at ¶13; see Wis. Stat. §51.15(1)(ag)(1.)–(3.).

The defendant also submitted a declaration from Doctor of Osteopathy Tony W. Thrasher, who is the Medical Director of Crisis Services at the BHD. Dkt. No. 96 at ¶¶2, 4. Dr. Thrasher avers that in September 2016, when law enforcement brought an individual to the BHD under an emergency detention, a physician within the PCS would conduct a medical evaluation of the individual. Id. at ¶5. The physician would then determine whether the individual should be admitted into the BHD under §51.15, transferred to a private psychiatric unit or discharged to an outpatient or community level of care. Id.

3. *Events of September 9, 2016*

On September 9, 2016, Milwaukee Police Officers detained the plaintiff under an emergency detention. Dkt. No. 95 at ¶7. Before that, he was a voluntary patient in the psychiatric unit at St. Francis–Ascension Hospital. Id.

8

at ¶¶8–9. During his stay at St. Francis-Ascension, the plaintiff had reported feeling suicidal and depressed, and he told hospital staff that he believed that people were "trying to harm him or kill him." Dkt. No. 97-3 at 5.[2] He was concerned that prison staff had "tr[ied] to poison him" during a previous incarceration, and he said that "police [were] trying to kill him and had planted gone [*sic*] on him." Id. The plaintiff eventually became "physically aggressive towards property and verbally aggressive towards staff;" staff attempts to verbally deescalate the situation were unsuccessful, and the arrival of security agitated the plaintiff further. Id. at 13. Security deemed it necessary to call the police; as hospital staff waited for the police to arrive, the plaintiff made further threatening statements, became combative, took his clothes off and lay on the floor screaming. Id. The police arrived, spoke with the plaintiff and decided that he "was too violent and the threats that [he] was making were too severe to remain at St. Francis." Id. A doctor discharged the plaintiff and the police handcuffed the plaintiff, removed him from the hospital and transferred him to the BHD. Id.; Dkt. No. 95 at ¶9.

The plaintiff was admitted to the PCS, and he signed a form consenting to "care and treatment as may be deemed proper in the judgement [*sic*] of the

---

[2] The nurse's notes reflect that when the plaintiff arrived on the unit near midnight, he'd refused to answer admission questions until someone found his prescription Xanax. Dkt. No. 97-3 at 13. The nurse wrote that she contacted the emergency department, the pharmacy and security, but that no one had seen the plaintiff with a prescription bottle. Id. The nurse relayed that information to the plaintiff; that is what appears to have caused him to become aggressive. Id. It appears that during the events at St. Francis, the plaintiff referred, more than once, to needing the medication and to people having stolen it. Id.

clinical staff of the Milwaukee County Behavioral Health Division." Dkt. No. 96-1 at 3. By signing this form, the plaintiff also acknowledged that he

> authorize[d] and consent[ed] to any services of an emergency nature, including but not limited to psychiatric interview and other diagnostic procedures, laboratory procedures, medical, and other hospital services which are deemed necessary or advisable to by the attending physician(s) and rendered to [him] under the general or specific instructions of said physician(s).

Id. The plaintiff was provided and signed a copy of an acknowledgment of his rights as a patient in the BHD. Id. at 4. This form acknowledged that staff had provided the plaintiff a copy of the "Client Rights and the Grievance Procedure for Inpatient Services" brochure given to hospital patients. Id.

A registered nurse at the PCS (not the defendant) conducted an initial nursing assessment of the plaintiff at 3:06 a.m. on September 9, 2016. Dkt. No. 95 at ¶11; Dkt. No. 96-1 at 9. The nurse wrote that the plaintiff was agitated, paranoid and depressed. Dkt. No. 96-1 at 9. He complained that staff at St. Francis "robbed [him], they took [his] xanax," they "lied to [him], then they said [he was] lying, that[']s real bullshit." Id. The plaintiff explained that he was "on [his] edge" because his sister "shot her head." Id. He said he was "ready to kill and ready to die," "tired of living like this" and "tired of going to county jail mistreating [him], starving [him]." Id. He told the nurse that he "want[ed] to know whole world to make news." Id. The plaintiff told the nurse that "he was going to kill hospital staff and the police would have to kill him to get him to stop." Id. The nurse recorded the plaintiff as saying, "I[']m going to make you all kill me." Id. At 4:07 a.m., the same nurse entered a progress note about her assessment of the plaintiff. Id. at 16. This note reiterates many of the

details from her assessment. Id. It also notes that the plaintiff claimed that he was supposed to take Xanax twice per day, and that he had last taken the medication at 6:00 p.m. while at St. Francis. Id. The nurse noted that staff would "monitor pt [patient] for unsafe behavior." Id.

The defendant was assigned as the plaintiff's primary nurse when she arrived at work at 6:45 a.m. Dkt. No. 93 at ¶¶19, 27. At around the same time, Dr. Sprung performed a medical screening and status of the plaintiff, and he completed a doctor's assessment about an hour after that. Dkt. No. 95 at ¶¶12–13; Dkt. No. 96-1 at 6–7, 18–19. Dr. Sprung's assessment showed that the plaintiff was fully alert, and he "presented with an irritable, elevated and angry mood." Dkt. No. 95 at ¶14; Dkt. No. 96-1 at 6. The plaintiff expressed homicidal and suicidal thoughts and showed poor judgment. Dkt. No. 95 at ¶14; Dkt. No. 96-1 at 6. He "also displayed suspicious, blaming, entitled and agitated behaviors." Dkt. No. 95 at ¶14; Dkt. No. 96-1 at 7.

Dr. Sprung conducted a Risk Assessment of the plaintiff, finding that he "displayed moderate self-harm behavior due to his suicidal ideation" and "also displayed as a risk for violent behavior due to his verbal aggression and violent ideations." Dkt. No. 95 at ¶15; Dkt. No. 96-1 at 14. At 6:50 a.m., Dr. Sprung entered a progress note that the plaintiff "was agitated" at St. Francis and claimed that staff there "stole his xanax upon check in." Dkt. No. 95 at ¶16; Dkt. No. 96-1 at 15. The plaintiff told Dr. Sprung that he "was to be treated for mood swings and he has been off depakote by 'bad choices.'" Dkt. No. 96-1 at 15. The plaintiff reported feeling that "people are after him, the police are

11

harassing him, that he will be killed on the streets as he is out of control and will go after the security people at [S]t. [F]rancis and the police will shoot him there." Id. Dr. Sprung reported that the plaintiff was "labile, intense and ruminative." Id. He planned to place the plaintiff on observation, resume the medication Depakote "and monitor for detox from benzos." Dkt. No. 95 at ¶17; Dkt. No. 96-1 at 15.

Dr. Sprung avers that, according to the plaintiff's medical records, sometime after 7:00 a.m. the plaintiff "engaged in disruptive behavior on the unit." Dkt. No. 95 at ¶18. Dr. Sprung avers that the plaintiff "was verbally aggressive, making verbal threats and physical threats to harm the defendant . . ." Id. The defendant entered a progress note at 10:43 a.m. further describing the plaintiff's behavior. Dkt. No. 96-1 at 15. The note says that the plaintiff "has been verbally loud on phone, making verbal threats on how he is going to buy [g]uns, 2 different types of guns, verbally stating [his] threats to kill people when he gets out of here." Id. The defendant documented that the plaintiff had threatened her, saying "I'm going to kill, wait til I get out of here! You are dead, wait til I get out of here, I'm coming back to get you, you're dead!" Id. The plaintiff was pacing and threatening "to phys[ic]ally destroy unit," was "verbally loud, verbally aggressive, disrupting unit." Id.

Based on the plaintiff's behavior, Dr. Sprung authorized the use of seclusion and restraints. Dkt. No. 95 at ¶19; Dkt. No. 96-1 at 21. The plaintiff voluntarily walked himself into the Seclusion Room with staff and security. Dkt. No. 96 at ¶9; Dkt. No. 96-1 at 24. Staff applied four-point restraints on

the plaintiff, and registered nurse Stephen Bradford administered "an intramuscular injection to calm him so that he would no longer be an immediate danger to his self or others." Dkt. No. 95 at ¶19; Dkt. No. 96-1 at 21. The plaintiff's records from the BHD pharmacy show that the injections contained Benadryl (diphenhydramine) and Haldol. Dkt. No. 96-1 at 20. The defendant's progress note about this incident says that the plaintiff "spit at RN Alicia [presumably the defendant], aimed but spit was missed." Id. at 15. At around 8:00 a.m., the defendant extended the plaintiff's seclusion an additional hour because of his continued behavioral issues. Id. at 15, 20. Staff called the Milwaukee County Sheriff's Office to report the plaintiff's "abuse with RN," and sheriff's deputies arrived to take the plaintiff "to Jail for disposition." Id. at 15. The plaintiff was discharged from the PCS at around 9:30 or 9:35 a.m. Id. at 22, 24.

Dr. Sprung avers that it "was medically appropriate to medicate" the plaintiff because of "his behavior and the risk that he posed to himself and others." Dkt. No. 95 at ¶20. He says that the use of the injection and restraints accorded with the BHD's "policy regarding the use of restraints and the emergent use of psychotropic medications." Id. Dr. Thrasher agrees with those assertions and avers that Dr. Sprung "appropriately ordered" the injections "under the circumstances." Dkt. No. 96 at ¶10. The defendant attached to Dr. Sprung's declaration a copy of various BHD policies and procedures. Dkt. No. 95-1. The policy on "Psychotropic Medications" that Dr. Sprung mentions provides that "[i]nvoluntary emergency medications may be administered

without the patient's consent only when there is clear evidence of behavior that poses a substantial risk or occurrence of serious self-injurious behavior and/or serious physical assault to others." <u>Id.</u> at 2.

4. *The Defendant's Deposition Testimony*

The defendant attached a transcript of a deposition that the plaintiff's counsel conducted of the defendant in August 2022. Dkt. No. 97-1. The testimony added detail to the events of September 9, 2016. The defendant testified that the main waiting area of the emergency room at PCS is "all open," and providers and patients "can hear everything." <u>Id.</u> at 17:10–11. There is a nurses' station and a doctors' station nearby, there are four "assessment booths" for intake and there are "recliners" instead of beds where patients may sit. <u>Id.</u> at 17:2–20. As the plaintiff's medical documents show, the defendant arrived at 6:45 a.m. and became the plaintiff's primary nurse for her shift. <u>Id.</u> at 18:15–18. She recounted that the plaintiff was at the BHD involuntarily, and that police officers had brought him there from St. Francis "because he destroyed the inpatient unit" there and "threatened to kill everybody inside St. Francis Hospital." <u>Id.</u> at 19:19–21:4. She noted that the plaintiff "signed his acknowledgement from administration," but said that staff "were trying to figure out why he even came to PCS because he should not have come in the first place." <u>Id.</u> at 21:23–22:4. She explained that there "should have been a report, doctor to doctor or nurse to nurse" determining whether the plaintiff met the criteria to be at PCS "because he destroyed the unit at St. Francis." <u>Id.</u>

14

at 22:8–13. The defendant could not answer when asked why the "normal process" was not followed. Id. at 23:3–9.

The defendant testified that she first spoke with the plaintiff when she "got on the floor, and that's when he started acting out." Id. at 25:22–23. She testified that "he was pacing all over the unit" where other patients and the recliners were. Id. at 26:3–9. She recounted the notes of her initial assessment with the plaintiff, during which he claimed that St. Francis staff "robbed" him and "took [his] Xanax," and he was "ready to kill" and "ready to die." Id. at 30:20–31:10. She clarified that her notes in her assessment were "quotes from [the plaintiff]" that she took contemporaneously on September 9, 2016. Id. at 31:19–32:7. She explained that, "[a]s a nurse, you document as you go . . . as it is happening." Id. at 58:10–13. She added that all nurses and medical staff at PCS "have to document ethically" what happens at the PCS. Id. at 62:5–8.

The defendant also recounted the details from her progress note, explaining that the plaintiff had "been verbally loud on the phone" and "was severely banging on the phone with harsh force, making verbal threats on how he's going to buy guns, two different types of guns, verbally stating homicidal threats to kill people when he gets out of here." Id. at 32:12–21. She explained that the phone was "an old public phone" that is "mounted on the wall" at PCS for use by all patients. Id. at 34:16–20. She testified that the plaintiff "was banging it, banging the head—the hand-held set on the device." Id. at 35:8–10.

The defendant recounted the plaintiff's "verbal threats to the nurse, meaning [her]," stating that he was "going to kill" and that he was "coming

back to get [her]." Id. at 32:22–33:1. She testified that the plaintiff was targeted "'and focusing on—on nurse,' which is [her]." Id. at 33:7–8. The defendant explained that the plaintiff was "pacing, amping, pacing, physically aggressive, he is yelling on the top of his lungs and just yelling, screaming out of normal tone behavior." Id. at 35:15–18. She testified that his behavior was "all continuous, nonstop pacing, screaming, yelling, banging back and forth, pacing all over the unit . . . threatening behavior, like he's going to charge and destroy the unit." Id. at 35:24–36:7. The defendant noted that "[a]ll working staff there that day" could hear the plaintiff "because he's yelling" in the open area. Id. at 36:8–13.

The defendant also testified about Dr. Sprung's decision to medicate the plaintiff. Id. at 38:15–19. She testified that, after Dr. Sprung "gives [the] order," id. at 38:24, security staff grabbed the plaintiff "arm to arm, but he didn't resist at all. He was cooperative. He walked himself into the seclusion room along with the nurses . . . ." id. at 39:1–5. She explained that the seclusion room is "just a couple feet away, around the corner" from the main area of the PCS. Id. at 39:12–15. PCS staff uses the room when patients "are a harm to themselves or others or, like, extreme violence, aggression. It's going to be, like, an extreme, violent episode." Id. at 39:18–21. She testified that staff restrained the plaintiff "by [his] wrists and ankles" with "Velcro restraints," and he was lying face up on a small bed "a couple of inches off the floor." Id. at 40:5–24. She reiterated that the plaintiff "cooperatively walked himself in and laid himself down on the restraint bed" with "[n]o resistance at all." Id. at 41:12–15.

She repeated that "everything that is said or done, is all documented," including restraining the plaintiff and his time in the seclusion room. Id. at 43:18–19.

The defendant testified that Dr. Sprung initially ordered Geodon,[3] but the plaintiff "claimed that he's allergic to Geodon." Id. at 44:10–11. She told the plaintiff "what he was receiving, and he refused that because he stated that he was allergic to it." Id. at 45:4–6. Dr. Sprung then changed the medicine to 10mg of Haldol[4] and 50mg of Benadryl, which Nurse Bradford gave the plaintiff at 8:10 a.m. Id. at 44:12–15. The defendant explained that there was a team of nurses, Dr. Sprung, a certified nursing assistant (CNA) and security staff present for the injections; it was "a team effort . . . for the safety of the working staff, everybody involved." Id. at 47:19–21. The defendant explained that Haldol is "a psychiatric medicine" that "helps with agitation, aggression, with psychosis, with mood, so it helps them be calm." Id. at 45:22–24. Benadryl is "also a form to help them relax, but it's just also to ensure there's no side effects." Id. at 46:1–2. She explained that the injections were given separately. Id. at 46:13–14.

---

[3] "Geodon" is the brand name for ziprasidone, a medication used in treating schizophrenia and bipolar disorder by balancing dopamine and serotonin levels. https://my.clevelandclinic.org/health/drugs/18590-ziprasidone-capsules.

[4] Haldol is the brand name for haloperidol, an antipsychotic that regulates dopamine levels. https://my.clevelandclinic.org/health/drugs/19626-haloperidol-tablets.

The defendant denied that the plaintiff objected to receiving the injections of Haldol and Benadryl. Id. at 48:23–49:6. She testified that the plaintiff "agreed with it because he refused the Geodon, so he was okay with receiving the Haldol and the Benadryl injection which he did not refuse." Id. at 49:6–9. She reiterated that "he was cooperative" while Nurse Bradford gave the plaintiff the injections. Id. at 49:9–11. She again denied that the plaintiff had opposed or refused the medications "because he was informed prior to receiving those medications. He was cooperative." Id. at 49:12–18. The defendant testified that the plaintiff "was completely cooperative and accepted these two medications verbally and physically." Id. at 49:22–24. When the plaintiff's counsel continued to press the defendant about the plaintiff's consent to receive the injections, she reiterated, "He did not object in any way, shape or form. He was completely cooperative in every way, shape and form. He was informed of all medicines, and he was very well aware of the whole process." Id. at 50:12–16. She gave the same answer to counsel's repeated questions about whether the plaintiff opposed the injections. Id. at 51:2–8.

The defendant testified that after the plaintiff received the injections, staff monitored him for an hour "to ensure that there's no adverse effects" from the medications. Id. at 51:14–17. She explained that the plaintiff had "no adverse reactions. He was completely safe. And, in fact, it helped him." Id. at 51:20–22. But the defendant testified that after staff explained "the process of why he's in seclusion, so then that's when he spit at [her]. He launched a big phlegm and spit it at [her]." Id. at 52:1–5. She testified that she "saw it coming, so [she]

stepped sideways to avoid that, that spit." Id. at 52:5–7. She testified that when the plaintiff continued "to be verbally aggressive post the restraint of one hour," PCS staff "extended it to an additional hour." Id. at 51:23–25. She added that PCS "staff did not feel safe," so they extended the plaintiff's time in seclusion "because the sheriffs were on their way." Id. at 56:4–6. The defendant added that the plaintiff seemed "just focused on [her]," possibly "because [she] was the primary assigned nurse, but there was no rhyme or reason of why." Id. at 53:3–10. She testified that he was not focused on other staff and "was just ranting in general." Id. at 53:11–14.

The defendant testified that the Milwaukee County sheriffs arrived at 9:30 a.m., and PCS staff "released [the plaintiff] out of restraints and discharged [him] to the sheriffs for a transfer to the Milwaukee County Jail." Id. at 53:25–54:4. She did not know who called the sheriff's office, but she opined that "they had to be called because of the spitting." Id. at 54:5–9. She testified that if the plaintiff had not spit at her, "he would have been moved then to the observation unit for further observation." Id. at 54:14–17. The defendant again emphasized that all PCS staff—herself, the other nurses, Dr. Sprung and the CNA—documented these events in their assessments and notes. Id. at 62:18–63:17. She pointed out that "all the nurses co-signed with [her]" the plaintiff's seclusion assessment, and that the CNA completed an "assessment for safety documentation." Id. at 63:12–15.

5. *The Plaintiff's Response to the Defendant's Proposed Facts and Declaration*

The plaintiff's responses to the defendant's proposed findings of fact generally agree or disagree with each proposed fact. See Dkt. No. 104-2. The plaintiff does not disagree with what the medical records show, but he contests the conclusions the court should draw from those records and often responds with "but see Declaration of the Plaintiff," listing specific paragraphs. See, *e.g.*, id. at ¶¶16–18, 29–32, 41, 44, 48, 52, 59, 67–69. He occasionally expresses "some disagreement" with a proposed fact and cites paragraphs from his declaration. See, *e.g.*, id. at ¶¶35–37, 43, 49–50, 56. The only proposed facts to which he registers "Disagreement and objection" are those discussing whether he consented to receive the injections and was cooperative while receiving them. Id. at ¶¶46–47. The plaintiff explains in his brief in opposition to summary judgment that "he is compelled by his lack of recollection and his present uncertainty to respond variously in substantial agreement, partial agreement, some disagreement, and complete disagreement to the recommended findings in" the defendant's proposed facts. Dkt. No. 104 at 3.

At the conclusion of his responses to the defendant's proposed findings of fact, the plaintiff asserts that there exists an additional, contested fact that requires the denial of the defendant's motion for summary judgment. Dkt. No. 104-2 at 13. The plaintiff says that he

> recalls with certainty and affirms with clarity that, at no time throughout his inpatient presence at the Milwaukee County Behavioral Health Division (BHD) on September 9, 2016, did he authorize, consent to, or otherwise approve of the intravenous administration to him of any psychiatric medicines, including but

not limited to Geodon, Haldol, or Benadryl, by and through the medical staff, including but not limited to Registered Nurse Alicia Sanchez.

Id. at ¶73. In support he cites several paragraphs of his declaration. Id. He adds in a footnote that there are "both substantial or insubstantial disagreements between the parties" about the details of the events from September 9, 2016. Id. at ¶73, n.1. He clarifies that none of those disagreements "rises to the level or even approaches the significance of a genuine dispute as to a material fact sufficient to require a trial." Id. He explains that "the singular, highly important disagreement" that precludes the entry of summary judgment is "whether consent and authorization was given for the administration of intravenous psychiatric medicines or, as the Plaintiff . . . maintains, he expressly, verbally, loudly, and repeatedly rejected and refused such consent and authorization." Id.

In his declaration, the plaintiff avers that on September 9, 2016, he voluntarily admitted himself to St. Francis Hospital because he felt "that [he] was about to have a mental health 'breakdown', which [he] had experienced before." Dkt. No. 104-1 at ¶¶3–4. He recalls making threats to injure himself and others at St. Francis, which he "attribute[s] to [his] long-standing, continuing challenges with mental illness." Id. at ¶5. He notes that his prescription of Xanax "had been either stolen or taken from [him] without [his] permission; this made [him] very angry, which [he] expressed loudly." Id. at ¶6.

The plaintiff recalls law enforcement officers transporting him from St. Francis to the BHD and telling him that he "would be released the following

morning if there were no patient beds available for [him] at the BHD." Id. at ¶¶7–8. He recalls a doctor and other medical staff, including the defendant, examining him at the BHD,. Id. at ¶9. The plaintiff agrees that during his examinations, he "was alert, oriented to [his] surroundings, and responsive to the questions and comments" from medical staff. Id. at ¶10.

The plaintiff avers that he called his mother to "discuss with her some difficult and troubling family issues relating to [his] brother and [his] sister." Id. at ¶11. He says that during this call, "medical staff told [him] that [he] was being too loud and asked [him] to 'quiet down,' which [he] did." Id. He avers that the defendant also asked him "what was 'going on,' and [he] told her: 'You're not concerned. Mind your own stupid ass business, bitch.'" Id. at ¶12. The plaintiff says that the defendant and other medical staff "were laughing and ridiculing [him] and acting in a hostile manner toward [him]." Id. at ¶13. He says that he "became very agitated and verbally abusive, eventually calling the defendant a 'bitch' and a 'whore.'" Id. He denies being "physically aggressive or threatening violence to" staff of the BHD or himself "during any of these first discussions." Id. at ¶14. He says he described being "extremely angry" about his missing medication from St. Francis. Id.

The plaintiff "recall[s] that" after about an hour at the BHD, he "was watching television." Id. at ¶15. He says that the defendant and other staff "asked [him] to follow them into a room that was adjacent to the area in which [he] was first examined." Id. The plaintiff "voluntarily did do [sic], walking behind them" into an area that was "isolated from other people at the BHD." Id.

The plaintiff says staff instructed him "to lay down on a medical bed, which [he] did voluntarily." Id. at ¶16. He says he "let the medical staff strap [him] to the bed with restraints on [his] torso, arms, and legs that prevented [him] from moving in any way." Id. He told medical staff that he "needed to urinate," and staff brought him "a portable urinal . . . so that [he] could do so, as [he] remained restrained on the medical bed." Id. at ¶17. The plaintiff reiterates that he did not object to being in "that restrained and immovable position." Id. at ¶18. He says he "understood from conversation among the medical staff, including the defendant, that they were about to administer to [him] a psychiatric medicine identified as Geodon." Id. He told staff that he is allergic to Geodon. Id. at ¶19.

The plaintiff then avers, "Significantly, [he] also expressed clearly and unmistakably [his] strong and vigorous objection to the administration of any intravenous medicines to [him], because [he has] long had a strong aversion to needles and to their use on [him]." Id. at ¶20. He says that medical staff, including the defendant, "unmistakably heard and understood [his] vocal opposition to any intravenous medicines." Id. at ¶21. He also "asked to be released from the bed restraints and permitted to leave the BHP [sic]." Id. The plaintiff avers that, despite his "repeated, vigorous objections to any intravenous medicines and [his] request to leave the facility completely, the medical staff, including [the defendant], proceeded to inject [him] with psychiatric medicines." Id. at ¶22. He says he only "later learned" that the medicines were Haldol and Benadryl. Id. The plaintiff avers that he "was very

upset by the decisions and actions of the medical staff, including [the defendant], to administer these psychiatric medicines to [him] contrary to [his] will and in complete disregard of [his] repeated statements in opposition." Id. at ¶23. The plaintiff says that, as he was objecting to being medicated, "[the defendant] again laughed at [him]." Id. at ¶24. He says he "became very angry and spat at her, but not on her." Id. He also recalls threatening medical staff, saying, "I wish I had an AK-47. I'd fuck you all up." Id. at ¶25.

The plaintiff avers that officers from the Milwaukee County Sheriff's Department arrived shortly after he was medicated, took him into their custody and transported him to the Milwaukee County Jail, where he "was charged with disorderly conduct." Id. at ¶26. He used his own money "to bail [him]self out of jail" after several hours and return to St. Francis Hospital "to attempt to get a new prescription of Xanax, replacing the one that was previously stolen or taken from [him]." Id. at ¶27. He says he eventually got a replacement prescription "but only after filing a written complaint with the Milwaukee Police Department about the theft or taking of [his] Xanax prescription." Id. at ¶28. He says the disorderly conduct charge "was eventually dismissed." Id. at ¶29.

The plaintiff reiterates, "At no time did I authorize the administration to me of any psychiatric medicines by the medical staff, including [the defendant], at the BHD, and I was loudly and repeatedly vocal in objecting to any intravenous objections throughout my stay there." Id. at ¶30. He says that he "suffered various severe physical reactions and irritating responses" to the medications, including "headache and body aches, pain and joint constrictions,

limb soreness and discomfort, and other similarly unpleasant, troublesome, and harsh ailments, sicknesses, and disorders." Id. at 31.

### 6. *The Plaintiff's Deposition*

Defense counsel deposed the plaintiff via Zoom on November 13, 2020, before the court had recruited counsel to represent him. Dkt. No. 97-2. The plaintiff first explained his voluntary stay at St. Francis and his missing Xanax that caused him to "los[e] [his] cool," after which he said the police escorted him to the BHD. Id. at 5:8–19. He says that he told the defendant "what was going on . . . and she laughed at [him] and kind of was being rude." Id. at 5:24–6:1. He got "real irritated" and told the defendant, "'If you don't want to know what's going on, don't ask me, you stupid bitch.'" Id. at 6:2–4. He testified that he went to watch television and that after about forty minutes, the defendant "and the security team" approached him and told him to go with them. Id. at 6:7–11. He followed them to "the strap-down bed, and then stuck [him] with a needle." Id. at 6:11–12. He says he asked staff why they were "all doing this" and insisted he was "clearly calm, chilling, watching TV." Id. at 6:13–14.[5]

Defense counsel asked the plaintiff to provide more details about his allegations. Id. at 6:16–18. The plaintiff denied becoming physically aggressive at St. Francis and opined that "when you get loud, they say that's physical aggression." Id. at 9:4–6. The plaintiff denied threatening to kill anyone or to shoot anyone at St. Francis with "an AK." Id. at 10:2–11:2. The plaintiff

---

[5] The plaintiff repeatedly mentioned cameras or footage of the September 9, 2016 incident. See Dkt. No. 97-2 at 6:6, 6:19, 16:19–22, 26:16–17, 29:25–30:1. Neither party submitted camera footage or video evidence from the incident.

Case 2:18-cv-00570-PP   Filed 12/29/23   Page 25 of 45   Document 106

testified that the officers who took him from St. Francis to the BHD "could have let [him] go back home. Like [he] could have done without all that stuff that happened at Milwaukee County." Id. at 15:3–6. But he then testified that he went to the BHD "voluntarily" and that he "told them that's fine . . . they can take [him] there." Id. at 15:14–18. The plaintiff claimed that he was not detained and was not taken to the BHD on "an emergency detention." Id. at 15:19–25.

The plaintiff testified that he spoke with a doctor and then the defendant and he reiterated that the defendant "got really rude with [him] and laughed at [him] like [he] was lying or something." Id. at 16:13–15. He then "called her a 'B' word, and then [he] went and sat down in the TV area." Id. at 16:17–18. He testified that there were "two other patients there." Id. at 43:23–24. The plaintiff said that after about forty minutes, the defendant "came back with all of the security and asked [him] to walk with them. [He] didn't resist. [He] walked with them." Id. at 16:22–25. He said he allowed security to "strap [him] down" and "was just thinking that was going to be that." Id. at 17:1–3. But then "[t]his lady went and got a needle and stuck [him] in the arm as calm as [he] was, and [he] got angry." Id. at 17:3–5. The plaintiff testified that he "tried to spit on her afterwards, and [he] missed." Id. at 17:7–8. He "tried to spit on her because she had no right sticking [him] with that needle." Id. at 27:15–17. He reiterated that he did not consent to receiving the injection. Id. at 17:23–24.

The plaintiff claimed that it was the defendant who gave him the intramuscular injection. Id. at 17:25–18:4. He testified that he knew the

defendant and had seen her "once before" during another stay at the BHD. Id. at 18:14–18. The plaintiff testified that if he had not told the defendant to leave him alone, "then she would have never stuck [him] with a needle." Id. at 25:20–24. The plaintiff recalled telling BHD staff "when they stuck [him] with the needle . . . 'I wish I had an AK-47.' . . . 'I would go fucking nuts on all you devils who just abuse me.'" Id. at 11:13–16.

The plaintiff did not specifically remember speaking with Dr. Sprung and did not recall saying that he was angry that St. Francis staff stole his Xanax; but he testified that he remembered "telling everybody that asked [him] what happened." Id. at 20:16–21:5. He did recall telling Dr. Sprung that his mood was unstable, that he felt anxious and agitated, that people were after him and that the police were harassing him. Id. at 39:3–40:2. He claimed that in 2016, "the cops was killing everybody all over America, and they was waiting to do that to [him]. . . . [He believed] they wanted to take the melanin out of [his] skin so they can inject it for their own personal uses, so they want to kill people that look like [him]." Id. 40:7–12.

The plaintiff testified that he did not become angry until "that lady was being rude to [him] and laughing in [his] face." Id. at 21:7–8. The plaintiff denied telling anyone that he was "going to get [him]self killed on the streets after [he] go[es] after the people at St. Francis." Id. at 21:13–17. He did not "recall ever saying no sick stuff like that." Id. at 21:19–20. But the plaintiff later said he was "not sure" whether he told a different nurse that he "wanted to commit suicide by police or security while [he] was at St. Francis" or that he

would "kill hospital staff." Id. at 23:16–25. He also testified that by the time he arrived at the BHD, he was "pretty calm" and no longer agitated. Id. at 24:14–16.

The plaintiff recalled talking to his mother on the phone, but he did not recall telling her that he was "going to buy guns" or "going to buy two different types of guns." Id. at 26:22–24, 28:10–15. He testified that his "mind was racing, and [he] probably was saying some stupid shit." Id. at 28:15–16. Defense counsel asked the plaintiff if he remembered telling his mother that he was "going to kill people when [he] got out of there" or threatening to kill anyone. Id. at 28:18–24. The plaintiff testified that he did not "recall telling [his] mama no shit like that." Id. at 28:20–21. He reiterated that he "cursed them out" after they "stuck [him] with that needle," but he did not recall "exactly what [he] said." Id. at 28:25–29:17. He later recalled telling medical staff, "Just because you violating me right now, you're going to have to see me later. I'll be back." Id. at 29:20–21. He testified that he was loud during his phone call, but that he quieted down when staff asked him to. Id. at 31:2–8. He denied pacing around the PCS area after he spoke with his mother. Id. at 30:17–31:1. The plaintiff insisted that the defendant's rude demeanor "didn't make [him] angry, because if [he] was angry, [he] would've became [*sic*] violent, and [he] never became violent with anyone." Id. at 32:24–33:1. He said that calling the defendant "a bitch" was not anger but "was kind of like tit for tat." Id. at 33:3–8. He claimed that his comment "made her angry," but he was not angry. Id. at

33:16–17. The plaintiff repeatedly denied threatening the defendant at her desk before he received the injections. Id. at 33:18–34:8, 34:23–35:2.

The plaintiff testified that three or four security guards were in the restraint room with him and the defendant. Id. at 36:23–37:2. He did not recall whether other nurses were in the room. Id. at 37:2–7. He declined seeing a doctor in the room before the injections. Id. at 37:8–14. The plaintiff "remember[ed] blinking a few times" after the injections and then "waking up being handcuffed by the sheriffs and charged with disorderly conduct, misdemeanor." Id. at 37:17–18. He said that he "blanked out" or "passed out" after the injections. Id. at 46:7, 22.

The plaintiff said he "probably" told the defendant that he was "sick of living like this." Id. at 41:17–19. He denied threatening "to destroy the unit" and again said he was "calmly watching TV minding [his] own business." Id. at 42:2–5. He claimed that "the people [defense counsel is] defending" were "just saying that to make it seem like they just was perfectly in the right for doing [him] like that." Id. at 42:12–15. He again denied being verbally aggressive toward the defendant and "just called her a bitch." Id. at 42:16–19. He said other staff members did not hear him speaking with the defendant "because it ain't like [he] was screaming and yelling like [he] was angry or something." Id. at 50:8–17. He testified that after he called the defendant a bitch, he "could just see how evil she was looking . . . like she wanted to kill [him] or something." Id. at 51:14–18. The plaintiff believed "it was her intention to

justify harming [him], but [he] didn't give her no justification because [he] calmly walked away and sat down and watched TV." Id. at 52:5–8.

The plaintiff testified that he suffered headaches and body soreness from the injections. Id. at 44:12–14. He said that he "probably got cancer. . . . she could have put something in [him] like they did those kids in Africa." Id. at 44:17–19. He suggested that he "probably got HIV now." Id. at 44:19. He repeated that he did not know what was in the injections, but that he "didn't consent for her to do it." Id. at 44:19–20, 23–24. He testified that his "back hurt," and he had "breathing problems like [he has] lung cancer or something." Id. at 45:3–4. He said that his HIV tests have been negative, and x-rays showed "no tumors or nothing" in his chest. Id. at 45:12–14.

The plaintiff testified that he has had memory problems since September 7, 2005, when he "was hit in the head" and spent about a month in the ICU at Aurora Sinai. Id. at 35:8–36:8. He said he was diagnosed with "malneurogatory [*sic*] trauma." Id. at 36:8–9. He testified that previously, when he was incarcerated at Mendota Mental Health Institute, doctors told him that he is paranoid or that he suffers from paranoid delusions. Id. at 57:5–11.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the

Case 2:18-cv-00570-PP   Filed 12/29/23   Page 30 of 45   Document 106

outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B.    Analysis

The defendant asserts that she is entitled to summary judgment for three reasons: 1) she did not personally administer the psychotropic drugs to the plaintiff and personally cannot be held liable for violating his rights; 2) administering the drugs to the plaintiff "was appropriate and medically necessary" for the safety of the plaintiff and the BHD staff; and 3) she is entitled to qualified immunity. Dkt. No. 94 at 9.

1.    *Personal Liability*

The defendant asserts that "[a]s a matter of law, the plaintiff's claim against [the defendant] fails because [the defendant] did not participate in the alleged constitutional violation of which [the plaintiff] complains." Dkt. No. 94 at 13. She cites a recent decision in which she says this court "grant[ed] summary judgment in favor of defendant in a § 1983 action where he could not

31

be liable due to lack of personal involvement." Id. (citing Lux v. City of Whitewater, 631 F. Supp. 3d 647, 667 (E.D. Wis. Sept. 28, 2022)). The defendant says that "the undisputed facts show that [the defendant] did not personally administer drugs to [the plaintiff] as he claims while he was at PCS." Id. at 12. The defendant asserts that it was Nurse Bradford who administered the medication, and that the defendant "had no part in that administration." Id. at 13. The defendant contends that because she "was not the perpetrator of any alleged violation of [the plaintiff's] rights but a victim of his outburst and threats," the court should grant her motion and dismiss this case. Id. at 14.

The defendant is correct that under §1983, a plaintiff's cause of action must be "based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." Hildebrant v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996)); see also Lux, 631 F. Supp. 3d at 667 (quoting Minix v. Canarecci, 597 F.3d 824, 833 (7th Cir. 2010)) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (internal quotation omitted). But the defendant's assertion that it is *undisputed* whether she was personally involved in administering the medication to the plaintiff is incorrect.

The defendant testified during her deposition that Nurse Bradford injected the plaintiff with the medications. The plaintiff's medical records also say that Bradford is the person who performed the injections. Dkt. No. 96-1 at

20. But the plaintiff provides two alternate versions of the facts, both of which assert that the defendant was involved. The verified, amended complaint alleges that the defendant and security escorted the plaintiff to the restraint bed, he "was then stuck with a ne[e]dle" and the plaintiff told the defendant "that she [could] not [*sic*] force medication upon [him]." Dkt. No. 18 at 2–3. These allegations imply that the defendant was the person who administered the medication, although they do not directly assert that she was. As the court explained above, the verified, amended complaint is the same as an affidavit for purposes of summary judgment. See Beal, 847 F.3d at 901.

The plaintiff's deposition testimony follows the allegations of his amended complaint, and he repeatedly testified that it was the defendant who injected him with the medications. He did not recall any other nurse being present in the seclusion room. Defense counsel conducted this deposition, and the defendant submitted the transcript of the deposition with her materials in support of her motion for summary judgment. Dkt. No. 97-2. The defendant cannot claim that it is "undisputed" whether she personally administered the medications when she herself provided evidence demonstrating the factual dispute. The plaintiff's declaration alternatively asserts that "medical staff, including [the defendant]" injected him with the medicines. Dkt. No. 104-1 at ¶¶21–23. Although this statement is vague, it nonetheless suggests that the defendant personally "caused or participated in" administering the drugs to the plaintiff. The plaintiff asserts that the "apparent factual chasm between the parties about who actually injected the drugs augurs in favor of a trial—during

which that issue would presumably be central to presentations on both sides." Dkt. No. 104 at 4.

Under either of the plaintiff's versions of the facts, the defendant was directly or indirectly involved in administering Haldol and Benadryl to the plaintiff. Her assertion that she was not, and that Nurse Bradford performed the injection, creates a genuine dispute of fact whether the defendant personally injected the plaintiff with the medications and whether she may be held personally liable. The defendant is not entitled to summary judgment on this basis.

### 2. *Appropriate and Medically Necessary*

The court explained in the screening order that the amended complaint did not make clear whether, at the time of the alleged events, the plaintiff was detained on criminal charges, voluntarily committed or involuntarily committed under state law. Dkt. No. 21 at 4. The evidence in the parties' summary judgment submissions clarifies that the plaintiff voluntarily sought care at St. Francis Hospital before officers escorted him to the BHD on an emergency detention order under Wis. Stat. §51.15. That suggests that he was temporarily, involuntarily detained for emergency care because of his perceived mental illness and risk to himself or others. He was not facing charges at that time and was not detained pending a trial or hearing. It was only after the events at the BHD that the plaintiff was charged with disorderly conduct and taken to the jail to await a hearing and process on that charge.

In the screening order, the court cited <u>Mills v. Rogers</u>, 457 U.S. 291, 299 n.16 (1982), for the proposition that "involuntarily committed mental patients do retain liberty interests protected directly by the Constitution . . . [and] these interests are implicated by the involuntary administration of antipsychotic drugs." Dkt. No. 21 at 5. But that statement was *dictum*, tucked in a footnote in the Supreme Court's decision. The Court explained that it was "[o]nly 'assuming' the existence of such interests," and took "no view as to the weight of such interests in comparison with possible countervailing state interests." <u>Mills</u>, 457 U.S. at 299 n.16.

This court also explained in the screening order that the Supreme Court has held that a sentenced and incarcerated person "'possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs,'" <u>id.</u> at 5–6 (quoting <u>Washington v. Harper</u>, 494 U.S. 210, 221 (1990)), and that pretrial detainees receive "at least" that same level of protection, <u>id.</u> at 6 (citing <u>Riggins v. Nevada</u>, 504 U.S. 127, 135 (1992)). The Seventh Circuit has extended the same liberty interest afforded to pretrial detainees and convicted persons to parolees. In <u>Felce v. Fiedler</u>, 974 F.2d 1484, 1485 (7th Cir. 1992), a Wisconsin parolee was required to choose between remaining on parole—a condition of which required him to receive monthly injections of an antipsychotic drug—or serving the remainder of his sentence in prison. The Seventh Circuit held that the parolee had "a liberty interest in not being subjected involuntarily to the administration of [antipsychotic] drugs except

when there is an 'overriding justification for their use and a determination of medical appropriateness.'" Id. at 1494 (quoting Riggins, 504 U.S. at 135).

This court more recently confronted a claim nearly identical to the plaintiff's. In Bond v. Bond, Case No. 20-cv-910-pp, 2021 WL 5770931, at *3 (E.D. Wis. Dec. 6, 2021), the plaintiff claimed that a CNA at the BHD "bound her to the bed and injected her with medications against her will." Id. The court did not cite Mills and observed that "neither the Supreme Court nor the Seventh Circuit has decided whether civilly committed individuals have a constitutional right to refuse psychotropic drugs." Id. (citing Kreger-Mueller v. Doe, Case No. 18-cv-708, 2019 WL 4256832, at *4 (W.D. Wis. Sept. 9, 2019)). The court quoted the same excerpt from Washington quoted above, adopted the analysis from the decision in Kreger-Mueller and allowed the plaintiff's claim to proceed. Id.

These cases suggest that the plaintiff, who was involuntarily committed at the BHD but was neither a pretrial detainee nor charged with or convicted of any crime at the time, had a protected liberty interest in not being involuntarily administered the Haldol and Benadryl with which he was injected on September 9, 2016. But they also suggest that the State has a competing interest that may outweigh the plaintiff's liberty interest. See Washington, 494 U.S. at 220–21. As one court in the Western District of Wisconsin explained, forcing antipsychotic medications on "a nonconsenting individual 'represents a substantial interference with that person's liberty,' that is justifiable only if the individual's liberty interest is outweighed by a state interest of sufficient

importance." <u>Enis v. Dep't of Health & Soc. Res. of the State of Wis.</u>, 962 F. Supp. 1192, 1197 (W.D. Wis. 1996) (quoting <u>Washington</u>, 494 U.S. at 220) (internal citation omitted); <u>see also</u> <u>Kreger-Mueller</u>, 2019 WL 4256832, at *5 (citing <u>Washington</u>, 494 U.S. at 225) ("Any interest in avoiding unwanted administration of medication must be balanced against the state's competing interests, such as its interest in preserving public safety and the safety of the patient in question."). This analysis implies that the court should make two factual inquiries: Did the plaintiff consent to receive the medications? And if he did not, was there an overriding state interest to justify forcibly medicating the plaintiff?

The evidence shows that there is a genuine dispute whether the plaintiff consented to receive the medication or whether the defendant (and/or other medical staff) administered the medications against the plaintiff's wishes and despite his adamant refusal. The defendant testified that the plaintiff consented to the treatment, accepted the medications "verbally and physically" and cooperated during the procedure. She stated multiple times that the plaintiff showed no opposition in any way, shape or form to receiving the injections. The defendant testified that the plaintiff refused Geodon because of an allergy and was fully informed that he instead would receive Haldol and Benadryl.

The plaintiff's medical records from the BHD do not state whether he consented or objected to receiving the injections. But he did sign the form consenting to "care and treatment as may be deemed proper in the judgement

[*sic*] of the clinical staff" at the BHD. Dkt. No. 96-1 at 3. Neither party mentions this form or analyzes whether it provided a basis for medical staff to administer the medications to the plaintiff even without his verbal consent at the time of the injections. But Drs. Sprung and Thrasher aver that the use of intramuscular injections was medically necessary given the plaintiff's behavior and that the injections were administered in accordance with the BHD's policy.

The plaintiff testified that he consented to being strapped down, but he said that the defendant then suddenly "stuck him with a needle" without his approval. He testified that the defendant personally injected him, that he did not know what was in the needle (he surmised it may have even been cancer or HIV) and that he never consented to the injection. He similarly avers in his declaration that he cooperated and volunteered to be strapped down in the seclusion room, but that he "clearly and unmistakably" objected to receiving the injections. Dkt. No. 104-1 at ¶20. He says that he only "later learned" that the injections were Haldol and Benadryl. Id. at ¶22.

That leaves the question of whether medicating the plaintiff against his will was nonetheless justified. The defendant asserts that, even if the plaintiff did not consent to receiving the medications, his "outburst and threatening behavior at PCS" justified the BHD employees' decision to medicate him forcibly and against his will. Dkt. No. 94 at 14. The plaintiff does not directly challenge this statement, asserting instead that evidence about "the practical propriety and medical necessity of the adopted and pursued course of medical care could and would . . . be the subject[] of evidentiary presentations" at trial.

Dkt. No. 104 at 5. He asserts, without elaboration, that "the need to safeguard both [the plaintiff] and the medical staff from harm . . . however legitimate and well-founded they may have been[, ]simply do not warrant the entry of judgment short of trial." Id.

There is a genuine dispute of material fact as to whether medical staff's decision to inject the plaintiff with antipsychotic medications was justified by his actions sufficient to overcome his putative liberty interest in not being forcibly medicated. Much of the evidence suggests that the plaintiff had been verbally aggressive, agitated and threatening toward staff at both St. Francis and the BHD. His medical records from both facilities document his outbursts and behavior, which included threatening to shoot and kill staff with two types of guns. The defendant testified to the same in her deposition, though much of what she said about the events involved her simply reading the plaintiff's medical records. But the plaintiff testified during his deposition that, although he may have been loud, he did not threaten anyone. He admitted calling the defendant a "bitch," but he said he did so only in response to her own behavior and to anger her, not to threaten her. He denied being angry or saying the "sick stuff" referenced in his medical records. He testified that he was calm by the time he arrived at the BHD, and that he was calmly watching television when the defendant and security took him to the seclusion room and injected him with the medications.

The plaintiff admits in his declaration that he was "agitated and disturbed" during the doctors' and nurses' assessments. Dkt. No. 104-1 at ¶10.

He echoes the statements in his deposition that he was loud on the phone with his mother, and he concedes he called the defendant a "bitch" and told her to mind her "own stupid business." Id. at ¶12. The plaintiff also admits to becoming "very agitated and verbally abusive" toward the defendant and other medical staff. Id. at ¶13. But he avers that "[a]t no time during any of these first discussions and initial verbal exchanges with the medical staff at BHD was [he] physically aggressive or threatening violence to them or to [him]self." Id. at ¶14. He admits telling them he "was extremely angry" about what allegedly had happened at St. Francis involving his missing Xanax prescription. Id. But the plaintiff says he "became verbally abusive and threatening" only *after* staff administered the medication. Id. at ¶25. He says it was then that he spit at the defendant and threatened medical staff. Id. at ¶¶24–25. He testified to much of the same in his deposition. See, *e.g.*, Dkt. No. 97-2 at 11:13–16.

Each party provided sufficient evidence to allow a reasonable jury to find in their favor on the question of whether the plaintiff consented to receive the Haldol and Benadryl injections and, if he did not, whether the BHD medical staff were justified in administering the medications to the plaintiff against his will. The court may not decide which of the competing versions of the facts is the correct one or which of the parties is more credible. Those decisions are for a jury to make. See Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704–05 (7th Cir. 2011) ("[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." (quotation marks

and internal citations omitted)). The defendant is not entitled to summary judgment on this basis.

### 3. *Qualified Immunity*

Finally, the defendant contends that even if she is not entitled to summary judgment on the merits, she is entitled to qualified immunity. Dkt. No. 94 at 15. The defendant asserts that she "did not and could not have violated the plaintiff's alleged liberty interest in avoiding the unwanted administration of antipsychotic drugs." Id. at 16. This is because, under her version of the facts, she neither ordered nor administered the medications to the plaintiff, and even if she had, "the administration of the drug [*sic*] was based on a physician's order and was medically necessary to prevent [the plaintiff] from harming himself or others." Id. She asserts that she is entitled to qualified immunity because "[t]here is no clearly established constitutional right to be free from an injection of psychotropic drugs that is medically necessary under the circumstances in this case." Id.

The plaintiff asserts that whether the defendant is entitled to qualified immunity would be "most sensibly resolved by a factual presentation of her actual role in the events about which [the plaintiff] complains." Dkt. No. 104 at 6. He suggests that this question would be "most accessibly and efficiently addressed . . . in the context of a trial." Id. at 5.

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

Figgs v. Dawson, 829 F.3d 895, 905 (7th Cir. 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)). Qualified immunity is an affirmative defense. To defeat the defendant's assertion of qualified immunity, the plaintiff must show that 1) the defendant violated his constitutional right, and 2) the right at issue was clearly established at the time of the violation. Pearson, 555 U.S. at 232. The plaintiff "bears the burden of convincing the court that a clearly established constitutional right existed at the time of the actions in question." Sherman v. Four Cnty. Counseling Ctr., 987 F.2d 397, 408 (7th Cir. 1993). If the plaintiff fails to satisfy either inquiry, the defendant is entitled to qualified immunity. See Muhammad v. Pearson, 900 F.3d 898, 904 (7th Cir. 2018) (citing Gibbs v. Lomas, 755 F.3d 529, 537 (7th Cir. 2014)).

The defendant improperly applies her qualified immunity analysis only to her version of the facts. For purposes of qualified immunity, the court must view the evidence in the light most favorable to the *plaintiff* because he is the nonmoving party. See Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019). As the court explained above, a reasonable jury could believe the plaintiff's evidence and conclude that he was calmly watching television at the BHD when the defendant and security escorted him to the seclusion room, where the defendant personally injected him with medications without his consent and without justification.

But as the court explained above and noted in a previous decision, "neither the Supreme Court nor the Seventh Circuit has decided whether civilly

committed individuals have a constitutional right to refuse psychotropic drugs." Bond, 2021 WL 5770931, at *3; see Kreger-Mueller, 2019 WL 4256832, at *4. In Mills, the Supreme Court *assumed* that "involuntarily committed mental patients" had such a protected liberty interest, but it did not make that holding. See Mills, 457 U.S. at 299 n.16. This court and others have allowed claims like the plaintiff's to move beyond screening under 28 U.S.C. §1915A. But the fact that similar claims have survived screening does not make the right on which they proceeded "clearly established." The plaintiff must show that the issue is "'dictated by controlling authority or a robust consensus of cases of persuasive authority, such that it would be clear to a reasonable [actor] that his conduct was unlawful in the situation he confronted.'" Holloway v. City of Milwaukee, 43 F.4th 760, 767 (7th Cir. 2022) (quoting Estate of Davis v. Ortiz, 987 F.3d 635, 638 (7th Cir. 2021) (internal quotation omitted)); see Wilson v. Layne, 526 U.S. 603, 617 (1999). The plaintiff has cited no cases discussing whether he had a right to refuse antipsychotic medication at the BHD. He has not addressed the absence of controlling authority on the question and he has not suggested that there exists a consensus of persuasive authority establishing this right. His insistence that a jury should decide the defendant's entitlement to qualified immunity at trial is a nonstarter because "qualified immunity 'is a matter of law for the court'"; it is "'not a jury question.'" Smith v. Finkley, 10 F.4th 725, 734 (7th Cir. 2021) (quoting Riccardo v. Rausch, 375 F.3d 521, 526 (7th Cir. 2004) and Warlick v. Cross, 969 F.2d 303, 305 (7th Cir. 1992)).

As of at least as recently as 2021, neither the Seventh Circuit nor the Supreme Court had determined whether a person involuntarily committed under an emergency detention had a constitutional right to refuse antipsychotic medication. That means that right could not have been "clearly established" five years earlier when the events in this case occurred. The defendant is entitled to qualified immunity as a matter of law, and the court will grant her motion for summary judgment.

## III. Conclusion

The court grants the defendant's motion for summary judgment. Dkt. No. 92.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If

the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 29th day of December, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**